J-S32031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.S.-P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.S.-P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 674 MDA 2025 |

Appeal from the Order Entered April 22, 2025
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000144-2025

BEFORE:   LAZARUS, P.J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED: OCOTBER 31, 2025**

Appellant, R.S.-P. ("Father"), appeals from the April 22, 2025 order of adjudication and disposition that found his son, K.S.-P. ("Child"), born in April 2025, dependent pursuant to 42 Pa.C.S.A. § 6302(1) of the Juvenile Act ("the Act"), and directing that Child be removed from the home.[1]  Upon review, we affirm.

We glean the relevant factual and procedural history from the certified record.  Mother has an extensive history with the York County Office of Children and Families ("CYF" or "the Agency") dating from 2015, when CYF

---

[*] Former Justice specially assigned to the Superior Court.

[1] Child's mother, S.S. ("Mother," collectively with Father, "Parents"), did not file an appeal and did not participate in the instant appeal.

received a child protective services referral alleging that Mother punched one of her other children in the face. *See* N.T., 4/22/25, at 11-12; *see also* Shelter Care Order, 4/11/25, at 2. Mother was indicated for child abuse as a result of the incident. *See id.* In addition, prior to Child's birth, CYF received general protective service referrals in 2016, and 2019, alleging that Mother was unable to adequately care for her five older children.[2] *See* N.T., 4/22/25, at 12-13. Mother has had no "custodial rights" to those children for approximately three years. *Id.* at 11, 33.

Most recently, the Agency received a referral shortly after Mother gave birth to Child at her home. *See* Shelter Care Order, 4/11/25, at 2. The referral raised allegations of domestic violence between Mother and Father. Specifically, the emergency medical technicians that transported Mother and Child to the hospital noticed "current bruises and injuries" on Mother that she was not able or willing to explain. N.T., 4/22/25, at 8-9. The referral also indicated that hospital personnel were concerned because Mother's demeanor changed in Father's presence. *See id.* at 9. Notably, the report also indicated that when Mother had been hospitalized several weeks prior to Child's birth, she requested that hospital staff "lock" her chart so Father could not gain

---

[2] Father is not the natural parent of Mother's five older children. However, the record reveals he has "other children" that reside in the Dominican Republic. *See* N.T, 4/22/25, at 23; *see also* N.T., 4/11/25, at 14-15. There is no indication in the certified record that CYF has a similar history with Father concerning his other children.

access and sought information regarding domestic violence shelters.[3]  Shelter Care Order, 4/11/25, at 2.

CYF caseworker, Jane Davis, spoke with Mother and Father prior to Mother's discharge from the hospital after Child's birth.  Upon questioning, Mother denied any instances of domestic violence.  *See id.*  She further told Ms. Davis that she planned to reside with Father upon her discharge from the hospital.  *See id.*  However, Father informed Ms. Davis that Mother and Child could not reside with him.  *See id.*

On April 9, 2025, CYF obtained emergency protective custody of Child upon his discharge from the hospital.  Following a shelter care hearing on April 11, 2025, the court maintained Child's placement in foster care.  The Agency filed a dependency petition on April 14, 2025, based upon a lack of proper parental care and control pursuant to 42 Pa.C.S.A. § 6302(1).

The court held the dependency hearing on April 22, 2025.  Parents were present and represented by separate counsel.  Child was represented by a guardian *ad litem* ("GAL").  CYF presented the testimony of its caseworker, Ms. Davis.  Mother and Father testified on their own behalf.[4]

---

[3] The reason for Mother's hospitalization is not provided in the certified record.

[4] As best we can discern from the certified record, Father speaks some English. However, during the subject hearing, the court utilized a Haitian Creole interpreter.  *See* N.T., 4/22/25, at 4.

The testimony revealed that, at the time of Child's removal, Parents were not cohabiting. Mother resided alone in an apartment, and her lease was set to expire approximately five weeks following the dependency hearing, at the end of May 2025. *See* N.T., 4/22/25, at 29. Father was residing in a four-bedroom house he rented with six other adults and a child of one of the other adults, and his lease was expiring in August 2025. *See id.* at 25, 27. Parents testified that they had discussed obtaining housing together, but there was no indication that they had success in finding a suitable residence. *See id.* at 27-28, 29-31. Finally, during the dependency hearing, Parents denied that they have a history of domestic violence existing between them. *See id.* at 15-16, 25, 30.

By order of adjudication and disposition dated and entered on April 22, 2025, the juvenile court adjudicated Child dependent and maintained his kinship placement. Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) on May 21, 2025. On June 20, 2025, the juvenile court filed a responsive Rule 1925(a) opinion.

On appeal, Father raises the following issues for our review:

I. Did the juvenile court err in adjudicating Child dependent in the absence of clear and convincing evidence that Father could not care for him?

II. Did the juvenile court err in removing Child from the care of Father in the absence of a clear necessity to do so?

J-S32031-25

Father's Brief at 5 (cleaned up).[5]

In reviewing dependency decisions, this Court recently stated the following:

> [W]e are required to accept the trial court's findings of fact and credibility determinations when supported by the record. **See In re R.J.T.**, 608 Pa. 9, 9 A.3d 1179, 1190 (2010). The Court is not required to accept the lower court's inferences or conclusions of law and accordingly reviews for an abuse of discretion. **See id.**
>
> A dependency hearing is a two-stage process governed by the Juvenile Act. The first stage requires the court to hear evidence on the dependency petition and to determine whether the child is dependent. **See** 42 Pa.C.S.A. § 6341(a). Section 6302, defines a "dependent child," in part, as one who:
>
> > is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent . . . that places the health, safety or welfare of the child at risk[.]
>
> 42 Pa.C.S.A. § 6302(1). This Court has held a child will be declared dependent when he is presently without proper parental care or control, and when such care and control are not immediately available. **See In re G.T.**, 845 A.2d 870, 872 (Pa. Super. 2004). Proper parental care has been defined as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." **In re A.B.**, 63 A.3d 345, 349 (Pa. Super. 2013) (internal quotation marks and citation omitted). "The question of whether a child is lacking proper parental care and control encompasses two discrete questions: whether the child presently is without proper care and control, and if so, whether such care and control is

---

[5] At the conclusion of the subject hearing, the GAL recommended adjudicating Child dependent and maintaining his foster placement. **See** N.T., 4/22/25, at 34-35. Further, the GAL filed a letter in lieu of a brief with this Court in support of affirming the juvenile court's order of adjudication and disposition.

immediately available." ***In re M.W.***, 842 A.2d 425, 428 (Pa. Super. 2004) (citation omitted). In answering the first question, the paramount concern is the "welfare of the child at the time of the hearing." ***In the Interest of Black***, 273 Pa.Super. 536, 417 A.2d 1178, 1183 (1980). In answering to the second question, "it may be necessary for the hearing court to look to the future." ***Id.*** at 1182.

A finding that a child is dependent requires proof by "clear and convincing evidence," *i.e.*, testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts at issue." ***Matter of C.R.S.***, 696 A.2d 840, 843 (Pa. Super. 1997) (internal quotation marks and citation omitted). If the court finds a child dependent, it proceeds to the second stage of the dependency process, which requires an appropriate disposition based on the best interest of the child pursuant to section 6351 (a) and (b). ***See*** 42 Pa.C.S.A. § 6341(a), (c); ***see also In re B.S.***, 923 A.2d 517, 521 (Pa. Super. 2007).

. . .

It is well-established that a "finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." ***In re E.B.***, 83 A.3d 426, 433 (Pa. Super. 2013) (citation omitted) (affirming the adjudication of dependency of an infant based on allegations the family's two older children were adjudicated dependent after physical abuse by father who was the subject of pending criminal charges). This Court has noted when dealing with an infant, the failure to allow prognostic evidence "would preclude a child welfare agency from ever seeking to have a newborn declared a [dependent] child, no matter how unfit or incompetent the natural parents are." ***Matter of DeSavage***, 241 Pa.Super. 174, 360 A.2d 237, 241 (1976) (affirming adjudication of dependency based on prognostic evidence including evidence of Mother's failure to visit and learn to properly feed infant while the infant was hospitalized); ***In re R.W.J.***, 826 A.2d 10 (Pa. Super. 2003) (affirming dependency adjudication of an infant where the adjudication was based solely on prognostic evidence concerning Mother's prior abuse and neglect of her other children). This Court has specifically stated that a rule prohibiting a court from considering prognostic evidence and compelling the court to place the child with natural

parents to determine if they can render proper care "ignores the possibility that if the 'experiment' proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal." *DeSavage*, 360 A.2d at 242 (emphasis added).

*Interest of S.D.*, 334 A.3d 919, 925-927 (Pa. Super. 2025).

Turning to the merits of this appeal, Father does not argue in his first issue that Child is presently lacking proper parental care and control. Instead, Father contends that the evidence was insufficient for the court to conclude that such care and control was not immediately available by him. **See** Father's Brief at 9-10. Finally, Father argues that the court abused its discretion to the extent that the court adjudicated Child dependent anticipating that he and Mother will begin cohabiting in the near future, and that they have a history of domestic violence. **See id.** at 10-11. We disagree.

In concluding that Child lacked the requisite parental care and control, the court reasoned as follows:

> [T]he court found that Child, a newborn who was only two weeks old at the time of adjudication, was without proper parental care and subsistence due to several safety concerns and such care was not immediately available. First, at the adjudicatory/dispositional hearing, the court did not believe that Father was ready to take care of Child, himself. Father did not indicate that he was willing and able to care for Child without Mother. . . .
>
> At the adjudicatory/dispositional hearing, when the court asked if Father intended to live with [] Mother, Father testified "[t]hat's what we had planned. That's what we had planned just before this case presented itself." [N.T., 4/22/25,] at 27. . . . The only comment Father made relative to Child without Mother, on direct examination, was that "Evidently, if [Child] came home with me, then I would accommodate h[im]" meaning that [Child] would sleep in his room. **Id.**[] at 26.

Thus, the court did not believe that Father was prepared to care for a newborn immediately, and his stated plan to raise Child with Mother implicated the court's concerns relative to both Mother and Father. First, there was the immediate concern regarding housing, as . . . Mother's lease [was set to expire at the end of May 2025]. This housing uncertainty caused Mother to plan to live with Father, which implicated CYF's and the court's second concern for Child's safety – domestic violence. Although Mother and Father denied domestic violence, the court did not find this testimony credible.

Additionally, . . . Father's current plan to live with Mother and raise Child together implicates the court's third concern for Child's safety regarding Mother's parenting capacity, which has been at issue for many years through [her] involvement with CYF. In considering all the testimony and history, the court found that CYF proved Child was dependent by clear and convincing evidence, and the court denies error in its adjudication of dependency.

Juvenile Court Opinion, 6/20/25, at 9-11.

Ms. Davis testified that when she spoke to Father soon after Child's birth, he stated that Mother and Child "could not reside with him."[6] Shelter Care Order, 4/11/25, at 2; *see also* N.T., 4/22/25, at 15. However, on direct examination during the dependency hearing, Father made a singular passing reference to caring for Child on his own, as follows:

Q: If [Child] came home with you, what would the sleeping arrangements be?

---

[6] While Ms. Davis stated that she may have misunderstood Father, she later stated that Father "does seem to understand English to a certain extent" and that interpretation services have not "appeared necessary" when she spoke to him. *See* N.T, 4/22/25, at 18.

A: Evidently, if [Child] were to come home with me then I would accommodate [him]. In our culture, usually we do two people per room.

N.T., 4/22/25, at 26. At that time, Father was residing with seven other people, six adults and one child, in a four-bedroom home. *See id.* at 25. While Father testified that he has a crib, there was no indication that he had any other supplies necessary for proper care of Child. *See id.* at 25-28. Thus, we conclude that the record amply supports the court's finding that Father was not able to immediately provide proper care or control to Child.

Further, testimony revealed that Parents planned to cohabit and raise Child together following the expiration of their leases. Specifically, Ms. Davis stated that, sometime after her initial conversation with Father, wherein he stated Mother and Child could not reside with him, "Father had expressed to me a desire [] for him and [M]other to have a place of their own where they could raise [C]hild together." *Id.* at 23. Indeed, Father testified that he and Mother are "already looking for other places" to reside. *Id.* at 27. He also testified that prior to the initiation of the instant case, Parents had intended to find a home together to raise Child. *See id.* at 27-28. Mother confirmed Parents' plan during direct examination, as follows:

Q: Have there been plans or discussions with [F]ather to see if the two of you can find a place?

A: It was brought up before, but, yeah.

Q: I'm sorry, it was brought up before?

- 9 -

A: [Y]eah, I said, because me and [Child] would need a place to stay and I was like – if he was willing to have us move in or, if not, we would have to go to the shelter.

*Id.* at 29-30.

Based upon the foregoing testimonial evidence, the court reasonably concluded that proper care or control was not immediately available to Child. Indeed, given Mother's extensive history with CYF, including, but not limited to, being indicated for "child abuse," and the history of domestic violence between Mother and Father, the evidence supports the court's decision to adjudicate Child dependent. *See S.D.*, 334 A.3d at 926-927 (reiterating that juvenile courts are permitted to rely on prognostic evidence to ensure a child's safety and wellbeing).

Turning to Father's second issue, he emphasizes that a child should not be removed from a parents care without "clear necessity." Father's Brief at 11 (citation omitted). Father refers this Court to the arguments proffered in his initial issue and concludes that there was no factual basis for the juvenile court to remove Child from his custody. *See id.* at 11; *see also* 42 Pa.C.S.A. § 6351(a) (Disposition of dependent child, General rule) (providing, "If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the safety, protection and physical, mental, and moral welfare of the child" as set forth in Section 6351(a)(1)-(3).); *see also* 42 Pa.C.S.A. § 6351(b) (Required preplacement findings).

Regarding this issue, the court briefly restated its analysis concerning Father's first issue and concluded that "[t]here were no feasible alternatives. The court believes that its dispositional order, in not allowing Child to live with Parents, is in Child's best interest and denies that its disposition was without clear necessity." *Id.* at 14-15. We agree.

As discussed *supra*, the juvenile court's findings are supported by the record. Father did not appear immediately available to care for Child. Further, Parents' plan to reside together prompted reasonable concern by the juvenile court regarding domestic violence between Parents and Mother's extensive history with CYF. Thus, we discern no abuse of discretion by the juvenile court in removing Child from Parents' care.

Accordingly, we affirm the juvenile court's order adjudicating Child dependent and removing him from Parents' care.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/31/2025